Thank you. Please be seated. This next case is case number 4-15-0791, Donna Cochran v. Securitas Security Services USA, Inc. Appearing for the appellant is Attorney Amelia Baragas, also David Doris, but it's my understanding Mr. Doris will not be arguing today. Is that correct? All right. Thank you. And for the appellee is Attorney Anthony Rutkowski. All right. Thank you. Ms. Baragas, are you ready to proceed? I am ready. You may. May it please the Court. Good morning. My name is Amelia Baragas. I'm appearing this morning on behalf of Doris Lawform and the plaintiff appellant Donna Cochran, who is acting in her capacity as the next of kin of her son, Walter Andrew Cochran. In many respects, this is a very routine case. This Court handles dozens of these types of appeals where the issue is whether or not the trial court properly granted a motion dismissed pursuant to 2615 or 2619. There's nothing unusual or extraordinary about that. However, the context by which this case has gotten here is somewhat unfamiliar in that the type of tort we are dealing with is relatively rare. And it's the tort for wrongful interference with the right to the possession of the decedent. It's a very old tort, but it's also a very unusual tort. And to some degree, there is a great deal of legal issues that have not yet been addressed by the appellate court because of that. However, before we get to any of those particular issues, which are very interesting and potentially could allow this Court to create new law in this area, we need to discuss the threshold inquiry of whether or not there was a duty. Because the trial court's order in this case was a finding that there was no duty on behalf of the defendant. And as such, there was no reason or no ability to go any further in the inquiry to whether or not the defendant had breached that duty, whether or not there was an approximate cause, or whether or not the damages requested were appropriate. Because obviously, dealing with very basic tort law, duty, breach, cause, and harm, absent duty, there is nothing else. The question of duty is relatively straightforward in this case. As I mentioned, this is a longstanding, well-accepted tort, not only in the state of Illinois, but throughout the country. It's recognized in both the original restatement of torts as well as the second restatement of torts. And both parties have acknowledged that and have brought that language to your attention. At its heart, the law simply says that anyone, or everyone more accurately, everyone has a duty not to interfere with the right of the next of kin to the possession of their decedent. And that includes the ability to determine the time, place, and manner of burial. It's a very broad, all-encompassing duty. And the few cases that are on record from our course of review establish that, that it is a very broad duty. There are cases where a hospital has been found liable for interfering with the right to the possession of a decedent, for its disposal of a fetus. There is a case where a funeral home was found to be in violation, or could be in violation, depending on the posture of the case, with the right to the possession of the decedent, because it cremated a body when it knew, or should have known, that it did not have the authority to do so. And there is a case, Ricochet v. Parks, where an ex-wife was found to be legally having potentially a duty that she violated when she interfered with the right to the true next of kin, which is the son of the decedent, and his ability to determine the time, place, and manner of burial. And that's a particularly interesting case because the ex-wife never even touched the body, never had actual physical possession of the body. But the fact that she interfered with its proper disposition gave rise to a legal cause of action. There was a duty. In this instance, plaintiff has originally brought suit against three entities under the facts of this case. As this panel is well aware, Walter Andrew Cochran died at a relatively young age and unexpectedly. Because of that, his body was transferred from Moultrie County to here in Springfield, pursuant to a coroner's inquest, so that an autopsy could be performed. It was at the request of the Moultrie County coroner. It was also consistent with the family's desires that an autopsy be performed, and then after the autopsy, he be buried. Unfortunately, when he was received at the hospital, his body was not properly labeled or identified. As a result, it was misidentified as another individual, was transferred to a funeral home, and cremated before the error could have been discovered. Plaintiff originally brought suit against three entities. The hospital, a security firm that was working security within the hospital, and who was responsible for taking in and releasing bodies at the morgue, as well as monitoring their location while at the hospital, and then the funeral home. As the statement of facts establishes, two of those defendants have now settled. The hospital and the funeral home are no longer part of this case. We are left with the security company, Defendant Securitas Security Services. Defendant asserts that it had no duty to the plaintiff, and the trial court agreed with that. However, the facts of the case, as well as the status of the law, which is a very broad, encompassing general duty on all individuals, establish that they did in fact have a duty. The security company, the facts clearly show, was responsible for receiving bodies at the morgue. They were responsible for ensuring that those bodies were labeled, and that they had an identification that was visible on the body at all times. It is undisputed, at the point in time that the body left the hospital, there was no external identification on the case that contained the body, in violation of hospital policies. It also is clear from the facts of the case, and from the facts alleged in the plaintiff's complaint, that the defendant, Securitas, was responsible for maintaining a logbook, and that they did so in error. That they misidentified the location of Walter Andrew Cochran's body as being in the same location as the body of William Carroll. As a result, when Butler Funeral Home came to the hospital and said, we would like the body of William Carroll, Securitas employees brought the wrong body, a body inside of a case with no identifying marks on it whatsoever, and said, here you go, this is the correct body. Now, the defendant has argued a number of legal issues that have nothing to do with duty. They are still nonetheless very interesting issues, but they do not address the very threshold inquiry of whether or not there was a duty. And in the current state of the law, and in the facts of this case, it is clear there was a duty. However, there are two issues that the defendant raises, that it might be useful for this court to provide some guidance on, because there has been no guidance on these issues in the prior appellate courts. And if this case is returned to the trial court as plaintiff requests, then the trial court might appreciate that guidance. And that has to do with the issue of willful and wanton, as well as the damages available to the plaintiff. So with regard to willful and wanton, the defendant has argued that under the current state of the law, the plaintiff must prove, in order to prove that the duty was breached, that the defendant was guilty of willful and wanton conduct, which is, of course, a form of enhanced negligence. And that the defendant has argued, absent willful and wanton conduct, they did not breach any duty, even if they had. And it is consistent with prior case law that the courts have continued to adhere to a willful and wanton standard in these types of cases, which was adopted nearly 100 years ago. However, that is inconsistent with the general evolution of the law in the restatement, as well as in how other states have responded to this type of tort, as well as how Illinois tort law has evolved. That it is not necessarily surprising that the language of the 1914 case, Menzinger v. O'Hara, referred to this willful and wanton activity. Tort cases from that time period always referred to willful and wanton, and much more extravagant language than perhaps we use today. However, now, those terms, willful and wanton, have a very specific meaning. And they also instill upon the parties in those cases where they apply a certain amount of immunity from lawsuit. So basically, what the defendant is asking for today is that they be given a qualified immunity, that unless their conduct rises to a certain level of culpability, they should not be held liable for what has happened. And that is inconsistent with the second restatement, which clearly has adopted a negligence standard. It also is inconsistent with other states where this has been raised in the appellate courts. The vast majority of those cases in those states, they have said, this is an area where we do not want to give a limited immunity to individuals who handle the remains of deceased individuals, because we actually want to do the opposite. That public policy says we want a negligence standard because we don't want mistakes to happen. We understand how very upsetting that can be to the family when your expectations of what is going to happen with the body of your loved one is upset. And so when it comes to that public policy point of view, it favors adoption of the second restatement. And it's very consistent with the state of Illinois, which has broadly adopted the language of the second restatement every single time that the courts have been asked to do so. In this particular instance, the courts have not previously been asked to do so. The other cases dealing with this type of tort, it has just been assumed by the parties that willful employment is required. So this is a new issue, and it's one that has not been discussed by the appellate courts previously. The final issue where some guidance from this appellate court might be appropriate  With the Supreme Court's ruling in the Rickey case, there created some confusion or some uncertainty in the appellate courts about what that meant. Rickey, obviously, was dealing with this very complicated question of when you have a case for negligent infliction of emotional distress, how do you deal with that? How do you not allow that tort to be so all-encompassing that almost any scenario would qualify as a lawsuit? And the balance that was struck in Illinois was the zone of danger test. It's a relatively common test, not every state has adopted it, but it is one way the courts have used to try to create a well-defined tort. And after the Rickey case, a number of appellate courts tried to figure out how the zone of danger test applied to other torts. Some found that it did, some found that it did not. To the extent that in 2011, the Illinois Supreme Court stepped in in Clark and said, no, no, wait a second. The zone of danger test only applies in cases where the plaintiff has fled negligent infliction of emotional distress. It's the only place where that applies. And that the general rule is that a plaintiff of any tort may freely request emotional distress as an element of damage. Unfortunately, this continues to create a little bit of confusion in this case because the tort for wrongful interference with the right to possession of the decedent, primarily the only damage that occurs is emotional distress or mental anguish or any other words you could use as a substitute. But there really is no other harm to the individual other than knowing that their desire and their wishes for the body of their loved one have not been adhered to. So if this court were to find that emotional distress was not an appropriate damage for this tort, this tort would basically disappear. There would be no ability to recover. And absent any damages, there is no case. It's duty, breach, cause, and harm. Absent a harm, there is no tort. So based on the Clark case, which has made it very, very clear that emotional distress can both be a cause of action when premised either in negligent infliction of emotional distress or intentional infliction of emotional distress and as an element of damages that is highly consistent with what plaintiff has fled here is that she is entitled to request emotional distress as an element of damages. And so your position is that opposing counsel is construing your action as a cause of action for negligent infliction of emotional distress while you're just alleging it as an element of damages. Yes, Your Honor. That is correct. Plaintiff has been very clear and freely admits we are not trying to premise a cause of action on negligent infliction of emotional distress. In fact, I would go so far as to say we could not because under these circumstances, there is no zone of danger. There is no personal injury. In this instance, the wrongful act of the cremation, the ultimate interference of the right to possession of the decedent, no one in the area of that activity was in any physical harm or could rationally argue that they had a fear for their own safety or that they suffered a physical manifestation of that fear. So it just would not be possible. And that's why this particular case, because the context is somewhat unfamiliar, it can be easy to make it seem as though it is more complicated than it is if we try to apply the elements or the facts and circumstances of other more familiar torts. That can't be done here. We need to stay very, very focused on the type of tort that this is, and that is the wrongful interference with the right to possession of the decedent. And both parties have cited relatively few cases because relatively few cases do exist with regard to this particular type of tort. It is worth noting, I think, despite the fact that the pool of cases is relatively small, that the defendant has not been able to provide any cases in support of his contention that there is no duty. Duty generally is freely presumed in this particular type of case. Although if we were going to extrapolate into a more familiar type of tort, we might look at a general automobile collision. It's very similar there. There is a general net, and it's very widely accepted, that individuals who engage in driving a vehicle on the roads of the state of Illinois have a general duty to conform their conduct with what is reasonable. And to the extent that a plaintiff brings a case and says, this individual was driving on the road, they have met the threshold of proving that individual had a duty. Now that doesn't mean they've proved that the individual has breached their duty or that they were a proximate cause of harm or these other elements, but you rarely, rarely, rarely see in a case for an automobile collision any argument that there was no duty because it is so broad, it is so encompassing, and it is so well accepted. That same is true here. It is widely accepted under Illinois law that everyone, without exception, has a generalized duty not to interfere with the right to the possession of the decedent. Now, the defendant does raise some issues with regard to whether or not the contract between the security company and the hospital would in any way change this. We've covered this at length in the briefs, but the existence of the contract does not in any way, shape, or form change the common law. The existence of the policy and procedures is evidence of what the parties acknowledge was reasonable conduct, but it does not give rise to this cause of action. There is a need to focus here on what the cause of action the plaintiff has pled is, and it is a common law of tort. It is not being given rise because of a voluntary assumption of a duty that did not otherwise exist under law. That's not applicable here. It did not arise because of the existence of a contract. This duty existed whether or not there was a written contract or not. The moment Securitas became involved in the handling of the remains of humans, it exposed itself to this duty under the law. It's a very straightforward one. So, in that respect, the primary and the threshold question for the court today is whether or not there was a duty. If so, then the trial court erred when it entered a motion to dismiss, pursuant to sections 2615 and 2619 under the Code of Civil Procedure. And as the plaintiff has argued here today, there was a duty. There's a very generalized duty that applies to anyone who handles the remains. The fact that the defendant believes that there is evidence that would explain their actions in a way that makes them not liable has nothing to do with whether or not there was a duty. The fact that defendant states that others were a proximate cause of harm to the plaintiff, which plaintiff acknowledges that we also agree that there were others who were a proximate cause of injury. That's why we had three defendants initially in this case. But all of those things, again, are a different portion of the analysis and do not diminish the fact that the defendant had a legal duty and that once plaintiff alleged that legal duty in the complaint, she met her burden of pleading. So as a result, Plaintiff Counsel, would you address your concerns about the trial court's resolution of this matter with respect to 615 and 619? Yes, Your Honor. 615 and 619 are two different legal inquiries to be made by the court. 615 is simply alleging that there is a legal deficiency in the complaint and that just looking at the complaint alone, even taking all facts as true, plaintiff has not stated a valid cause of action. 619 is somewhat different. 619 is often referred to as summary judgment light, and that is where the moving party would bring in some other fact or evidence through affidavits or the pleadings or some other documented evidence that would say there is some other affirmative matter that stops this. One example of that would be if there was an action moving forward for the failure, let's say, to pay a bill under a contract, so breach of contract where payment had not been made. A proper 619 motion might be to bring an affidavit and proof attached to that affidavit saying actually proof was made, the payment was made, and as a result there's no need for this case to move forward. So the fact that the trial court stated that there was no duty pursuant to 619 is somewhat atypical and more likely this is actually just a 615 order and that the court inadvertently also included language of 619, although the parties are not in dispute that the written order is consistent with the court's ruling. There's no dispute there. It's just that legally it makes sense under 615, and that's important to this court's inquiry because if this is a motion to dismiss pursuant to 615, the evidence that may be considered by the court is somewhat limited only to that evidence contained within the complaint. So it does simplify the analysis for the court. Thank you. As a result, plaintiffs would respectfully request that the trial court order granting the defense motion to dismiss be reversed, in this case be sent back to the trial court for further proceedings. Thank you. All right. Thank you. Mr. Rutkowski. May it please the court. My name is Anthony Rutkowski. I represent Securitas Security Services USA, Inc. in this matter. The threshold question that we really have before us is why are we here? We're not here because of anything more than an attempt by the plaintiff to have this court act as legislature rather than as court. Counsel, what affirmative matter under 2619 was presented in your motion that would bar plaintiff's complaint? There was no set of facts whatsoever. That's a 2615 motion. No, Your Honor, if I may try to explain. We kept separate arguments between 2615 and 2619 in our briefs, but the arguments are similar in the sense that the 2615 motion, as you point out, goes directly towards what was alleged in the pleadings. This case is unique. We have a third amended complaint. There was factual discovery that occurred. The court saw a request to admit facts and documentation produced during discovery that was not considered as part of 2615. When the court ruled on this in terms of 2619, looking at this, and the issue is duty. Where the plaintiff and I differ is how you define duty. Duty is defined by the case law in this situation. It has to do with refraining from willful and wanton conduct. It has nothing to do with a negligence standard. So the issue is whether someone could ever plead sufficient facts, and it's my understanding that the trial court in this case in ruling ruled not only under 2615 that the plaintiff had failed after three attempts to plead sufficient facts, but then when looking beyond the four corners of the complaint and looking at the factual evidence, the plaintiff could never be able to plead the set of facts that would rise to the level of willful and wanton conduct, and that's why the trial court ruled under 2619 as well. I don't understand that. What you've just said might be true under 2615. There was no set of facts that could be pledged establishing a duty. But 2619 requires the pleading of affirmative matter. And as I read your motion and as I read the order, this wasn't a 2619 case. Your Honor, I can only tell you how the court ruled. We have the order that the court entered. We don't have the factual argument presented or the court's ruling other than that. And we review it de novo, correct? Yes. So this is your opportunity to explain to us why a 2619 dismissal was appropriate. Under 2619, there would be an obligation to allege willful and wanton conduct on the part of my client. There were no allegations whatsoever of willful and wanton conduct. When we looked at the factual evidence in the case, in terms of what happened, the court determined that there was never a set of facts that could sustain an allegation of willful and wanton conduct. The reason being what happened in this case is that William Carroll's body was brought into MMC, Memorial Medical Center. My client is a provider of manpower security, strictly. We don't do pathology. We don't handle dead bodies. We are not trained in handling the human remains. And I've got to stop you there for a moment. Are you stating facts that were alleged in the Third Amendment complaint, or are you asserting facts that were presented via exhibits? Via exhibits under the 2619 portion. And just in that respect, how is it proper to attach exhibits not appended to affidavits to a motion to dismiss? The exhibits that were attached, if you go back and look at the briefs, the plaintiffs had tendered a request to admit facts, which was responded to, and cited those very exhibits. Those exhibits were provided to the court to provide content about what was admitted and what was denied with respect to the request to admit. That was not objected to on the part of the plaintiff. In the lower court, in fact, it was actually argued by the plaintiff both in their brief and in oral argument. Are you suggesting that we can consider the facts that are contained in those exhibits that aren't supported by way of affidavit or deposition? I would say that you are able to consider those simply because they relate directly to the request to admit facts that was tendered. Were the responses to the request to admit attached to the motion to dismiss? They were provided actually by the plaintiff in their response brief to the motion to dismiss. But what I'm asking is what we have to consider in our de novo review. By rule, we are allowed to review not only the pleadings, but as well affidavits that are in conformance to rule or depositions that are attached in support of a 2619 motion. It doesn't look like we have either at play here. I can't disagree with what you're observing. What I'm saying is that in response to the motion to dismiss, the plaintiff put forth the request to admit facts, which referenced the very documents that are in Exhibit C. So the issue was not introduced actually by the defendant. It was introduced by the plaintiff. But maybe we aren't allowed to review those either. I would submit that I believe that you are because of the nature of the request to admit facts. Ordinarily in cases where you have a 2619 motion, you haven't been at issue to reach discovery yet. This case is somewhat unique in that there was some discovery that was conducted, and that discovery then was relied upon by the plaintiff in filing the response. If you go back and look at the motion, the initial motion did not have those documents attached. It was only after the plaintiff introduced those in their response brief that then those documents were provided as clarification. If I may, the issue about duty in this case is not a generalized duty. It's not a duty under negligence. The issue is about the duty to refrain from willful and wanton conduct. That's the duty that should have been alleged in the complaint. If we go back to the four corners of the plaintiff's complaint, and it's the third amended complaint, there's no allegation of willful and wanton conduct at all in the complaint. There's one paragraph that references duty, and that paragraph does not reference willful and wanton conduct. Under the 2615 argument presented to the court, it was stated that there was no allegation of willful and wanton conduct. Dating back to the Messinger case, which is 1914, the law in Illinois has been that if there's a duty to refrain from interference with the right to possess the body of a decedent, that duty is to refrain from willful and wanton conduct. Every case that's been cited by both parties in this case under Illinois law has held that. Now there's a discussion about the restatement, Section 868, and the second restatement. Both of those came after the 1914 decision. Illinois courts have not adopted those, and they've been given the opportunity to do so. I believe that there are two reasons for this. One is because the court sufficiently addressed this issue back in 1914. Secondly, the Illinois legislature enacted the Illinois Crematory Regulation Act, which requires someone who is going to cremate a body to verify the identity of the remains before cremation. The issue, as you just heard from the plaintiff, is an identification about the remains of the body. The issue was never Securitas' responsibility, and the complaint does not show in any way that it was Securitas' responsibility to identify the remains of the body. Instead, by statute, that's the Moultrie County Coroner. And factually, as alleged in the complaint, the Moultrie County Coroner brought this body to MMC. Securitas' function at that point in time, since MMC has its own security department, is very simple. MMC's security department receives a call from Moultrie County. They're bringing in a body. They don't like to bring bodies in the main entrance of the hospital. They bring them in via the loading dock. Securitas people are supposed to escort that body to the morgue. They complete a log sheet. Once they do, the task is done. In this case, if you may, Guards 1 and 2 perform that task with William Carroll. Guards 3 and 4 perform that task with Walter Cochran. Guards 5 and 6 facilitate Butler's pickup of a body in a Ziegler case. Now, Your Honor, respectfully, there's some discussion in the briefs about what constitutes a Ziegler case and whether it was cited in the record. It was cited in the record previously on the motions to dismiss. It was instructed for the court, and the court took notice of that. The Ziegler case is a steel box. It has no windows. It has no identifiers. It's meant to be sealed. So as a result, Securitas officers never open this box. The identifier for this body, when the security department for MMC tells them that Butler Funeral Home is coming to pick up this body, is in fact the Ziegler case. What transpires in the morgue is nothing to do with what Securitas' responsibilities are at MMC. To go back to what you just said a moment ago, when we look at the request to admit facts, there was a request to admit facts about policy. The law in Illinois under the Illinois Administrative Code requires that MMC set the policy regarding bodies at the hospital. That's undisputed. The policy was MMC's policy, not Securitas' policy. Securitas receives a direction from MMC that Butler will be there to pick up the body in the Ziegler case. They facilitate that pickup. That's what happened here. Securitas doesn't have any issue that rises to the level of willful and wanton conduct. And that's what the trial court looked at. Under 2615... Well, excuse me, Counselor, you say that's what the trial court looked at. What evidence is there in the record that the trial court granted the motion to dismiss based on a failure to plead willful and wanton conduct? Because of the issue of duty, Your Honor. The issue of duty is not a generalized duty. If we were to talk about the duty under a negligence standard, we would look at the duty to exercise ordinary care. The duty with respect to interference with the right to possess the body of a decedent is the duty to refrain from willful and wanton conduct. That was not alleged in the complaint. If you look at the complaint, you'll see there's a single paragraph, I believe it's paragraph 34, that alleges a duty. The duty never addresses the issue of willful and wanton conduct. Moreover, nowhere within the bounds of the complaint is there ever a mention of willful and wanton conduct. Assuming willful and wanton conduct is necessary in order to sustain an action such as this, is it necessary that the words willful and wanton be used in the pleading, or is it for the court to evaluate whether or not that conduct that is alleged rises to the level of willful and wanton? I believe that the words should be in the complaint. Is there a case authority that supports it? I do not have a case cited, Your Honor. I will tell you that if we go back and look at the history of this case, this is not the first time that this issue had been dealt with by this court. So we're on the third amended complaint. The issues all along in the record had to do with willful and wanton conduct versus negligence. Initially, this case was pled as a negligence cause of action, and then separately, but not alternatively, as a willful and wanton cause of action. That's what was argued. The court ruled that mere negligence is insufficient to sustain a cause of action based upon the case law and so on. The issue was willful and wanton conduct. In the guise of the previous complaints, that had not been pled. The plaintiff had been given essentially three chances to plead willful and such an allegation. You note in the brief that we cited this issue of Rule 137, the issue is good faith pleadings. In order to be able to plead willful and wanton conduct, you have to have a good faith basis to do so. Under the facts that is known to the parties in this case, there's insufficient facts to be able to ever sustain a cause of action for willful and wanton conduct, and then the words willful and wanton do not appear in the complaint. If, for the sake of argument, that one were to construe the Third Amendment complaint as mere negligence allegations instead, in that situation, the court's already granted a motion to dismiss on mere negligence. Instead, the issue is you have to plead willful and wanton. That's what was interpreted by the court. That was the cause of action that was argued by the plaintiff. The plaintiff actually conceded in their brief that they had not pled willful and wanton, and the arguments provided in their response to the motion to dismiss were, in essence, to ask the court to change the law, to disregard the law from 1914, to disregard the law all the way through to, I believe, the last case is 2006. Instead, in each one of the cases that were cited, the standard that the courts applied was willful and wanton conduct. The plaintiff doesn't have sufficient facts to sustain a claim for willful and wanton conduct. That's why they want to change the standard. They want to change it and make it a negligence standard. You talked a little bit about the handling of the negligence cause of action below, and the court finding that there is no cause of action based on negligence. You agree that the second restatement of torts allows for a negligence cause of action in a case such as this, but Illinois has not adopted the restatement. I don't want to argue necessarily. I realize I'm here on oral argument, but I think it's important to take a look at what the second restatement says. You'll indulge me for a moment if you'll let me read it to you. This is on page 15 of my brief as well. The second restatement, section 868, says one who intentionally, recklessly, or negligently removes, withholds, mutilates, or operates upon the body of a dead person or prevents its proper internment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body. To your point, the word negligence obviously appears in the second restatement, but the question is what does that word refer to? I would submit to you that under the restatement they use the words intentionally, recklessly, or negligently in reference to remove, withhold, mutilate, or operate. And in this case, we did none of those. There has been no pleading at all that we in any way mutilated, operated on this body. That's undisputed. Do you think, have you looked at the cases that have cited the restatement to determine whether or not state courts, other than Illinois obviously, have interpreted that section according to the way you just have described it here? I will tell you that I have not conducted a thorough search of every case that involves the restatement. There are cases that were cited in the plaintiff's reply brief. Those cases, the way they interpret the conduct, have to do with these sort of things where we're withholding, we're removing, we're mutilating, we're operating. And that's where the majority of the damage when you have an issue about the body of the decedent rests. When we're talking about preventing proper interment, Securitas did none of that. Whether it's intentionally, whether it's negligently or otherwise, there's no evidence that they did that. Instead, all they were was an intermediary. They escorted one party to pick up a body. What happens here operationally is that Securitas has no authority whatsoever to release any bodies from the morgue. That's the province of MMC. When a body is supposed to be released from the morgue, the pathologist at MMC informs not only the security department at MMC, but also informs the particular entity who's there to pick up the body. In this case, Butler Funeral Home and Crematory. They inform Butler as to who they're picking up, and they give Butler the identifiers. In this case, it was the body in the Ziegler case, believed to be William Carroll. They also tell the security department, that is an MMC department, not Securitas. MMC's security department then tells Securitas that Butler will be there to pick up the body in the Ziegler case. Then the task of the security officer is to meet the Butler representative at the loading dock, escort them to the pathology department where they pick up the Ziegler case. They take the Ziegler case back to the loading dock. Then they take it back to their establishment, where the cremation is supposed to occur. By Illinois statute, the crematorium has the obligation to verify the identity of the body before cremation. What about before release of the body? I'm sorry, Your Honor. I didn't hear you because the train was... Oh, okay. I'll speak up a little bit. There was information in the brief that there's supposed to be a tag on the body, a visible tag on the body. What role, if any, did Securitas play or what obligation did they have with respect to that visible tag? The issue is the Ziegler case, and that's why it was cited. The Ziegler case is a sealed box that has no other identifier. It has no window. You don't have the ability to open the box, and we're talking about human remains. The whole reason why a Ziegler case is used is because of the decomposed nature of the body and the health issues involved. So the identifier that Securitas gets is the Ziegler case. They're told the body is in that case. Now, the hospital only used one case, and as you see from the record, it's undisputed that the body of William Carroll was placed in that Ziegler case when it was brought into the pathology department. So was the body of Walter Cochran. We don't have two bodies in that case. What happened in the pathology department is the problems of the pathology department, not the Securitas officers. So we don't have any control whatsoever about what happens once the body is delivered, and we don't have any control over the directions we get regarding pickup. But my question is this. What is the responsibility of Securitas with the tag? Let's assume we're not dealing with the Ziegler case for my question. Then what is the responsibility? What do they do? If you look at, I believe it's Exhibit C, it's MMC's policy. What they are to do is to make sure that the body is tagged when it comes in. Who's they? Securitas. By statute, the coroner of the particular county who's bringing the body has the obligation to tag that body. So in this case, the Moultrie County coroner would have that obligation. A coroner would not ordinarily bring in a body untagged or unidentified. The job of the Securitas officer, when that body comes in, is to ensure that there's identification. So the coroner, in other words, shows that there's a tag or identifier on the body that comes in. And then there's a form. A log book. Well, if you look at Exhibit D, you'll see that the logs are actually pieces of paper. And so it's noted on the log that there was ID. And you also note on the forms that when the body is placed in the Ziegler case, the word Ziegler is to be placed on the dispatch, which is where it was placed in this case. So this body sat in the morgue for two days before it was released. So what happened in the morgue, Securitas doesn't have any responsibility for it. They're not in the morgue. The only thing they do is facilitate the delivery or facilitate the pickup. On the pickup, so that I can complete the answer to your question, the issue is about the identifiers for the body. When that decomposed remains is in that Ziegler case, the identifier then becomes the Ziegler. So the pathologist tells the security department, MMC's own department, Butler Funeral Home will be here to pick up the Ziegler case. And in it is the body of, in this case, they were told, William Carroll. Securitas has a piece of paper that says William Carroll's body is in the Ziegler case. They're given that. They then are supposed to meet Butler at the loading dock, escort them to pathology, let them pick up the Ziegler case, have them sign off on the Ziegler case. There is no expectation on Securitas's part to open the Ziegler case or in any way handle any of the remains contained inside. So they're absolved of their identification responsibilities with respect to release if a Ziegler case is involved. Is that what you're saying? I would say that you're saying absolved. I'm saying that the identifier that they're given is the body of this person in the Ziegler case. They have no reason to doubt the information that's being given to them by the security department because the pathology department gave the security department that information. I guess where I'm coming from is part of the contract is they are to make sure they're to check, right, the identification before release. Actually, on admission, they're to make sure that there is a tag on the body. That's what's said in the post order. Okay. And I'm not trying to argue. The contract is for basic services. The post order describes what needs to be done in relation to the pickup and delivery of bodies. So on delivery, they check to make sure there's an ID tag. They would otherwise make the Moultrie County coroner put a tag on the body. Okay. On pickup, because it's in the Ziegler case, they don't have any obligation under those policies of MMC to open the Ziegler case or in any way to touch or handle the remains. Nor are they trained to do so. Can they request that the funeral home open the Ziegler case so they can check identification? I mean, if we weren't dealing with the Ziegler case, would they say, okay, I see this tag here and release? Your Honor, I simply don't know the answer to that question because I don't know if the people that are picking up the body from the funeral home are actually equipped to be able to handle it. Other than to carry the case or the body bag out, what I do know is that by statute, the funeral home has the obligation to verify identity. So in this case, the body of William Carroll is an 80-year-old man. The body of Walter Cochran is a 40-year-old man. I would think there would be some difference. When the body appears at Butler Funeral Home and has no identification and they cremate the body, they violate the statute. The Illinois legislature has taken the responsibility of enacting the statute for just this purpose, to protect the plaintiff in this case. Okay. I understand. I think you've answered my question to the best of your ability. Thank you. Thank you. Thank you, Mr. McCaskill. Thank you. All right. Rebuttal argument. Thank you, Your Honor. Counsel has just cited a number of facts. And this brings us to one of the issues plaintiff has raised with the difficulties of the fact that many of the items placed into the record by the defendant are not properly supported by affidavit or other testimony that is rightfully before this court. And the problem is that absent that interpretation of the documents, counsel is interpreting those documents. He is providing his argument and his view of what the facts state. That is not properly before this court. And counsel has provided a number of his factual assertions to fill in some of the blanks that quite simply are not within any of the items currently in the record on appeal. A lot of the information about what MMSC did, who they called, who the pathologists talked to, that at this point in time is all speculation and is quite simply not in any of the documents or necessarily a permissible inference from the documents before this court. That is why Supreme Court Rule 191A exists is so that you're not just given a bunch of documents and counsel are allowed to tell you what they mean, but so that the actual individuals with information about those documents and the policies and procedures and all of the details that really matter here or by an individual who is competent to testify. Counsel and I are not competent to testify in this case. That is not our role. Our role right now is to explain to you the law and what is in the record. Our role right now is not to argue to you why we think that we could win at trial. And that is why not only this appellate court in Nessig, but the Supreme Court has taken a very, very rigid interpretation of Supreme Court Rule 191 that it must be followed. Otherwise, the appellate court and the court's review quite simply cannot consider the information because it lacks the context that the court needs. So your attachment and your response to documentation doesn't get him over the hump of what he's supposed to do with respect to the motions dismissed? It does not, Your Honor. The plaintiff attached two items to our response in the trial court. The request to admit staff, which is permissible to do, as well as the state statute for easy reference for the trial court. That is well within what is permissible and is actually desirable to trial court level to do that where you are referring to a statute or ordinance or some other, actually it was administrative code, that the court might not have readily available to it. Obviously that is perhaps becoming less important with computers, but nonetheless it is a courtesy to the court and it is permissible because the court may always take into account existing law. The court may not necessarily take into account facts unless they are properly brought before the court. Counsel also makes some inferences with regard to the third amended complaint. This is the third amended complaint. There are a number of reasons that it is the third amended complaint, but to draw the inference that the fact that there is a third amended complaint somehow is supportive of defendant's argument that the plaintiff cannot plead a duty on behalf of the defendant is just inappropriate or improper. There really is no inference that can be drawn from that. In fact, the plaintiff voluntarily withdrew, I believe the record will show that the plaintiff voluntarily withdrew the third amended complaint when the other two defendants were dismissed. Likewise, defendant discussed at some length the fact that the language willful and wanton were not contained within the complaint. Now, to the contrary, if plaintiff had put the words willful and wanton, then counsel would be arguing that plaintiff conceded that willful and wanton was required. It is not.  Not the magic words used by counsel in the complaint. And that is why counsel has consistently argued throughout this motion to dismiss in the alternative. And it continues to be counsel's position that the conduct complained of of the defendant rises to the level of willful and wanton. And that it is very, very similar to the facts before the court in Drakeford, where there was evidence that the hospital did not follow its own policies and procedures, which led to the wrongful internment of an infant who died at the hospital. And that the facts are similar enough that this rises to the level of willful and wanton, and that it is reckless conduct. Plaintiff concurrently argues that that issue is one that this court should revisit, whether or not willful and wanton is truly an appropriate standard here. And plaintiff, as already discussed, has provided support for the contention that a willful and wanton standard is quite simply antiquated. It's no longer consistent with the status of Illinois law with regard to willful and wanton standard. It's only used when we're trying to convey some sort of limited immunity to one of the parties, usually when a government entity is involved. And that other states have adopted the second restatement, which discusses the negligence standard. So based on that, plaintiff would respectfully request that this court overrule the trial court ruling and return this matter for further consideration. Okay. Thank you, counsel. Thank you both. The case is going to be taken under advisement and a written decision will issue.